DREAZY, Respondent, v. NORTH SHORE PUBLISHING COM-
PANY, INC., Appellant.

*No. 166. Argued November 2, 1971.—Decided November 30, 1971.*
(Also reported in 191 N. W. 2d 720.)

For the appellant there was a brief by *Kohner, Mann & Kailas,* attorneys, and *Robert L. Mann* of counsel, all of Milwaukee, and oral argument by *Robert L. Mann.*

For the respondent there was a brief by *Brennan & Brennan* and *Joseph K. Brennan,* all of Milwaukee, and oral argument by *Joseph K. Brennan.*

CONNOR T. HANSEN, J. We consider this appeal presents two issues: (1) Sufficiency of the evidence, and (2) error in instructions to the jury.

*Sufficiency of the evidence.*

The resolution of this issue requires a review of the evidence. Plaintiff was a salesman of printing supplies and in the early part of 1968, during one of his regular calls on defendant, he discussed with its president, Eugene Polka, the possibility of being paid a commission for bringing printing business to the defendant. Plaintiff testified that Polka was receptive to the idea and agreed to compensate plaintiff to the extent of 10 percent of the gross sales of any business that plaintiff brought in and which was accepted by the defendant. They also discussed the possibility of plaintiff becoming a broker, but plaintiff indicated he was not knowledgeable in the printing business and stated he "would simply serve in the capacity of bringing in business that would be accepted or rejected by them." Polka had indicated that this was acceptable. Plaintiff told Polka that he was not knowledgeable to do anything other than bring together a willing buyer and a willing seller. He would give him a potential job in the palm of his hand which Polka could accept or reject.

The instant litigation concerns a commission on a printing contract entered into between defendant and Hi-Time Publishing Company. The parties stipulated that the total amount of the Hi-Time contract was $290,758.25.

Through a former business associate, who was the accountant for Hi-Time, plaintiff was able to meet Michael Vogl, the production editor of Hi-Time. From Vogl, he obtained publication samples and some details with respect to their printing specifications. Plaintiff took the samples and information to Polka who expressed an interest in the work and requested plaintiff to set up a meeting with Hi-Time so that a representative of defendant could call on them. Plaintiff arranged for a meeting with Vogl during the latter part of June, 1968. Richard Stone, defendant's secretary-treasurer, was to meet with Vogl, and plaintiff met Stone for the first time just prior to this meeting. Plaintiff was also present at the meeting. Vogl indicated Hi-Time was not dissatisfied with its present printer and the only reason that would cause them to change printers would be a more favorable price and better service. Plaintiff then introduced Stone to Hi-Time's accountant, and through conversation with the accountant, Stone was able to indirectly ascertain the range of prices previously paid by Hi-Time.

At a second meeting at Hi-Time, attended by plaintiff, Stone, Vogl, and Miss Macken the president of Hi-Time, Stone submitted proposals. At this meeting, Miss Macken showed some hesitancy in doing business with defendant because of previous dealings with certain individuals in the company. Plaintiff took part in convincing her that these individuals were no longer associated with defendant. Plaintiff testified that representatives of Hi-Time expressed an interest in the proposals and that on the same day the group went to the defendant company to view its facilities. He also testified to a conversation with Stone concerning the commission on the proposed Hi-Time contract just prior to this second meeting at Hi-Time. It was his testimony that Stone produced an informal contract which Stone said they would write up to reflect a two and one-half

percent commission on gross sales. Plaintiff agreed to this proposal, but the contract was never executed. Plaintiff frequented defendant's plant every two or three days during the first month and a half of production, but thereafter voluntarily stopped coming because he felt he no longer was performing any function.

Plaintiff testified he was thereafter unable to reach Polka although he made numerous attempts by telephone and by personal calls. He also sent two letters to which he received no response. The letters were introduced in evidence and read to the jury. Plaintiff eventually was able to contact Polka by telephone, at which time Polka indicated that Stone felt plaintiff had not earned any commission on the Hi-Time contract. At the request of Polka, plaintiff drafted a letter reciting the events which led to the acquisition of the Hi-Time contract. The letter was introduced in evidence and read to the jury. Plaintiff received no response to this letter and again contacted Polka by telephone. Plaintiff received no commission nor had any further contact with defendant.

Polka testified that his first conversation with plaintiff in regard to the latter bringing in business was a brief meeting at which he merely acknowledged that defendant accepted brokered printing, with commissions ranging from zero to 10 percent. Plaintiff did not mention any specific jobs at this time and there was no discussion with respect to plaintiff's knowledge of printing. Several weeks later, plaintiff presented some samples; whereupon, Polka introduced plaintiff to Stone. Nothing was said at this time in regard to commissions. Polka further testified to the duties of a broker and stated that the contract between defendant and Hi-Time was not a brokered job.

On rebuttal, plaintiff testified that at the first meeting between himself and Polka, the latter stated that if

plaintiff would bring in a job, and if defendant accepted it, plaintiff would be entitled to a commission of 10 percent; and that there was no mention of a range from zero to 10 percent.

Richard Stone testified that he first met plaintiff when Mr. Polka brought him into his office and introduced him, stating that plaintiff was a broker of printing and could be instrumental in helping defendant gain a contract with Hi-Time. Plaintiff was unable, however, to give him any details with respect to the printing specifications of Hi-Time. Stone further testified to a later conversation with plaintiff, in Stone's office, in regard to commission. This meeting took place after the first meeting at Hi-Time with Vogl. Stone told plaintiff that there would be a markup on the major part of the Hi-Time business of five percent and defendant was willing to share this with plaintiff for his participation in the endeavor. Plaintiff was to receive a commission of two and one-half percent only if defendant realized a profit of five percent. As it turned out, no profit was made; the markup was traded away during negotiations. Stone further testified that this agreement with plaintiff was made prior to his learning that plaintiff had no special competence as a printer or broker of printing business, and that plaintiff performed no further services subsequent to the second meeting with representatives of Hi-Time.

The applicable standard in reviewing the sufficiency of the evidence was restated in *Balen v. Franklin* (1964), 25 Wis. 2d 246, 253, 254, 130 N. W. 2d 747:

" 'Citation of authority is not needed for the oft-quoted rule that the evidence must be viewed in the light most favorable to the verdict and if there is any credible evidence which under any reasonable view will sustain a verdict, which has the approval of the trial court, this court ought not upset it.' "

Applying this standard, the record discloses sufficient credible evidence upon which the jury could reasonably find the existence and performance of a contract between plaintiff and defendant.

Reduced to its bare essentials, we have a situation where Stone takes the position that plaintiff was to receive a commission of two and one-half percent only if defendant realized a profit of five percent, which he said it did not. Whereas, the plaintiff takes the position he was to receive a commission of two and one-half percent of the total contract price. Considering the posture of the instant case, the resolution of this issue calls for a factual determination by the trier of fact, in this case the jury.

Where it is apparent that the intent of the parties was to enter into a contract, the contract should not fail for indefiniteness if the conduct of the parties will reasonably supply the omissions. *Lien v. Pitts* (1970), 46 Wis. 2d 35, 44, 174 N. W. 2d 462; *Shetney v. Shetney* (1970), 49 Wis. 2d 26, 39, 181 N. W. 2d 516.

The record supports a finding that defendant's president agreed that if plaintiff obtained a potential customer or job for defendant's benefit, which resulted in a contract between defendant and the customer, plaintiff would be entitled to a commission on the sale price. Thus, at its inception the agreement more closely resembled an executory, bilateral contract. Neither party was bound to perform until the plaintiff obtained business that was accepted by the defendant.[1] It cannot be said as a matter of law that plaintiff was required to present to defendant specific terms in the form of an offer. ". . . [W]here the parties disagree in their recollection concerning the terms of an oral contract the terms employed and the construction of such terms is a question

---

[1] *First Wisconsin Nat. Bank v. Oby* (1971), 52 Wis. 2d 1, 188 N. W. 2d 454.

for the jury." *Kaley v. Van Ostrand* (1908), 134 Wis. 443, 446, 114 N. W. 817. The record discloses that plaintiff obtained samples for a particular job and presented them to defendant, set up a meeting at defendant's request, and took part in negotiations between defendant and Hi-Time. Considering plaintiff's admitted lack of knowledge in the printing business and defendant's alleged knowledge of this fact, plaintiff did all that he was capable of doing under the circumstances. Any indefiniteness as to the amount of commission earned by plaintiff was made definite at two and one-half percent by the agreement between plaintiff and Stone. The jury was entitled to believe plaintiff's version, that commission was based on sale price or invoice price and was not dependent on the realization of a profit. Any indefiniteness as to the nature and character of the services to be rendered by plaintiff was made definite by his performance.

### *Jury instructions.*

Appellant further argues that it was error not to instruct the jury on the meaning of the word "obtained." The jury was asked two questions with respect to the existence and performance of a contract between plaintiff and defendant:

". . . *Question No. 1:* Was there a contract between Russell D. Dreazy and the North Shore Publishing Company, Inc., whereby Russell D. Dreazy was to obtain printing contracts for North Shore Publishing Company, Inc.? . . .

"*Question No. 2:* If you answer Question No. 1 'Yes' then answer this question: Was the printing contract between North Shore Publishing Company, Inc., and Hi-Time Publishing Company obtained through the efforts of Russell D. Dreazy? . . ."

In instructing the jury, the trial court stated:

"Question No. 2 asks you if Russell Dreazy obtained the contract between North Shore Publishing Company, Inc., and Hi-Time Publishing Company. It is conceded that such a contract did exist but this is not enough for you to answer this question 'Yes.' You must decide whether he obtained the contract."

It is the contention of appellant that the jury was not given an adequate standard on which to answer the special verdict, *viz.*, a definition of the word "obtained." Defendant submitted the following requested instruction:

"You are instructed that in order to obtain a contract, the party charged with that duty must be the major factor in the execution of the contract. While it is not necessary that he be solely responsible for the contract, neither is it sufficient that he merely took part in the negotiations leading up to it."

However, in the instant case, no special significance or technical definition attached to the word "obtain" except insofar as it was generally descriptive of the performance required by plaintiff under the contract. In this context, the requested instruction would have invaded the province of the jury in their determination of what the terms of the contract were. Hence, the meaning of the word "obtain" was a question of fact for the jury. *Kaley v. Van Ostrand, supra.* Furthermore, the trial court adequately instructed the jury in this regard:

"Whether the parties to a contract gave it a particular construction is to be regarded by you in giving effect to the provisions of the contract. The subsequent acts of the parties, showing the construction that they themselves have put upon the agreement are to be considered by you for the purpose of assisting you in arriving at a determination of what the arrangement was between the parties."

Under such circumstances, it was not error for the court to refuse the requested instructions. *Kenwood Equipment, Inc. v. Aetna Ins. Co.* (1970), 48 Wis. 2d 472, 180 N. W. 2d 750.

*By the Court.*—Judgment affirmed.